1  SCOTT + SCOTT, LLP
2  CHRISTOPHER M. BURKE (214799)
   KRISTEN M. ANDERSON (246108)
3  5455 Wilshire Blvd., Suite 1800
   Los Angeles, CA 90035
4  Telephone: 213/985-1274
5  213/985-1278 (fax)
   cburke@scott-scott.com
6  kanderson@scott-scott.com
7
   Counsel for Plaintiff
8  [Additional Counsel on Signature Page]
9
10            UNITED STATES DISTRICT COURT
11           CENTRAL DISTRICT OF CALIFORNIA
12
   MICHAEL ROBERTS, on Behalf of        CV09-1886 PSG (CTx)
13 Himself and All Others Similarly
14 Situated,                            COMPLAINT
                          Plaintiff,    CLASS ACTION
15
16      vs.                             JURY TRIAL DEMANDED
17 UNITEDHEALTH GROUP, INC.,
18 INGENIX, INC., WELLPOINT, INC.
   and BLUE CROSS OF CALIFORNIA,
19
                          Defendants.
20
21
22
23
24
25
26
27
28

   COMPLAINT

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, in that the claims asserted herein are brought under federal statutes and necessarily involve adjudication of one or more federal questions. For Plaintiff's Sherman Act claims, jurisdiction arises under 28 U.S.C. §1331 and 28 U.S.C. §1337. For Plaintiff's ERISA claims, jurisdiction arises under 28 U.SC. §1331 and ERISA §502(e), 29 U.S.C. §1132(e). The Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1332 (d)(2).

2. This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and each Defendant systematically and continuously conduct business in this State, and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction over them.

3. Venue is appropriately established in this Court under 28 U.S.C. §1391, 18 U.S.C. §1965, and 29 U.S.C. §1132(e)(2) because Defendants conduct a substantial amount of business in this District, including marketing, advertising and selling insurance products, and administering health plans to residents inside this District.

## PREAMBLE

4. Plaintiff Michael Roberts, on behalf of himself and all others similarly situated, by and through his undersigned attorneys, allege, upon knowledge with respect to his own acts and upon information and belief with respect to all other matters, as follows.

5. Among consumer decisions, the selection and purchase of health insurance is of vital importance. According to a recent survey by the New York Attorney General, obtaining affordable healthcare is the number one concern of consumers. This case is about an agreement among health insurers to depress reimbursements for out-of-network services, thus raising the cost of healthcare, and keeping this agreement hidden from consumers.

COMPLAINT

- 1 -

6. Many health insurers, including WellPoint, Inc. ("WellPoint") offer health insurance plans that differentiate between (i) coverage for medical treatment from in-network providers who have negotiated discounted rates with the insurer; and (ii) coverage for treatment from out-of-network providers who charge insured their usual, non-discounted rates. Health insurance plans that permit insured individuals ("members") to seek medical care from out-of-network providers are more expensive than plans that limit members to care provided by in-network providers – *i.e.*, they require higher premium payments.

7. For members who have contracted to obtain out-of-network benefits, and agreed to pay the higher premium, health insurers generally reimburse members for out-of-network services ("ONS") at the lesser of either a percentage of: (i) the actual amount of their medical bills; or (ii) the usual and customary rate ("UCR") of doctors in the same or similar geographic area for the substantially the same service.

8. Plaintiff's claims in this case are directed at the illegal agreement by WellPoint, UnitedHealth Group, Inc. ("UHG"), Ingenix, Inc. ("Ingenix"), and most of the country's largest health insurers to systemically under-reimburse consumers for ONS as a result of the illegal agreement. Defendants' conduct affects millions of consumers nationwide who have had to pay more for ONS. The instrument to accomplish this design is a data services platform known as the Ingenix Database, maintained by Ingenix, which is wholly-owned and operated by UHG. WellPoint and the co-conspirators named herein ("Co-Conspirators") contract with Ingenix to provide ONS data claims and receive uniform pricing schedules in the form of UCRs, which in turn are used to calculate ONS reimbursements at artificially low rates.

9. Plaintiff alleges (i) direct agreements in the form of contracts between Ingenix and many of the country's largest health insurers, including WellPoint, to obtain and/or provide UCR pricing information; and (ii) a lengthy chronology of facts that demonstrates conspiracy between and among WellPoint, UHG, Ingenix, and their

COMPLAINT

Co-Conspirators to use Ingenix to cap UCRs used to determine the amount to reimburse members for ONS. This conduct violates §1 of the Sherman Act.

10. Ingenix serves as the conduit of the conspiracy and is the hidden profit engine of the health insurance business. Ingenix contracts with most of the country's largest health insurers, including WellPoint and the other Co-Conspirators, to collect ONS claims data. After Ingenix collects the data, it aggregates and manipulates that data to create UCR schedules that it sells to most of the country's largest health insurers, including WellPoint. Using the Ingenix UCR schedules, WellPoint and its Co-Conspirators were able to under-reimburse Plaintiff and the damages class, defined herein, for ONS.

11. WellPoint and its Co-Conspirators hid this scheme, including the existence and purpose of the Ingenix Database, through a series of omissions and misrepresentations. There is an irremediable conflict of interest in having a price-setting mechanism, the Ingenix Database, which is controlled by UHG, WellPoint and other health insurers, create uniform UCR schedules that result in the systematic under-reimbursement of members for ONS.

12. Until recent news reports detailed the New York Attorney General's investigation, the process of setting UCRs used to determine ONS reimbursement was effectively hidden from consumers. This lack of transparency was facilitated by the following practices:

- In their healthcare plans that cover ONS treatment, WellPoint and other insurers affirmatively represented that they will reimburse according to UCRs, which the reasonable consumer would understand to literally mean the "usual and customary rate" charged for such services;

- Defendants did not disclose a conflict of interest, *i.e.*, that the Ingenix Database, which is owned and controlled by insurance companies in agreement with WellPoint and other insurers, determine UCRs;

COMPLAINT

- Defendants concealed that the insurers regularly and intentionally exclude important data points to depress UCRs and under-reimburse for ONS; and

- Defendants concealed that Ingenix scrubs the data it received from WellPoint and other insurers to remove information that would result in higher reimbursement rates.

13.  As a result, Plaintiff and the classes did not know Ingenix existed, let alone how it functioned, what the true UCRs were, or how much they were harmed.

14.  WellPoint's actions also constitute a breach of its healthcare plans, including Plaintiff's employer-sponsored benefit plan, Employee Elect Medical Plan, ERISA, and non-ERISA contracts by using flawed or inadequate data to determine UCR amounts, resulting in reimbursements well below actual UCRs for such ONS.

15.  Plaintiff alleges that WellPoint breached its fiduciary duties under ERISA, and as such Plaintiff seeks equitable relief as well as unpaid benefits for the reduced ONS reimbursements for which he exhausted his administrative remedies.

## BACKGROUND

16.  WellPoint is the country's largest health insurer, insuring more than 33 million persons.

17.  From at least as early as 1998 to the present (hereinafter, the "Relevant Time Period"), WellPoint and other health insurance companies agreed to manipulate the rates used to reimburse members for out-of-network medical services. Pursuant to this agreement, WellPoint and its Co-Conspirators knowingly created and used flawed data maintained in a database owned by Ingenix to set artificially low reimbursement rates for ONS. WellPoint's and its Co-Conspirators' conduct violates the Sherman Act and ERISA.

18.  During times relevant to the Complaint and continuing through the present, Plaintiff has been, and is, a member of a group health plan offered through his employer and issued and administered by Blue Cross of California, a division of

COMPLAINT

WellPoint. Plaintiff's plan subjects WellPoint to ERISA and its attendant regulations. WellPoint's role in administering employee benefit plans, which includes, but is not limited to, setting reimbursement rates, making other coverage and benefit decisions, and deciding appeals, made WellPoint a fiduciary to its plan members under ERISA.

19.     WellPoint issues Combined Evidence of Coverage and Disclosure Forms ("EOCs" or "Certificates") to Plaintiff and other participants/beneficiaries setting forth the benefits WellPoint agrees to pay members. WellPoint's EOCs typically provide that beneficiaries can utilize the services of both "in-network" and "out-of-network" healthcare providers. Services by "in-network" providers are reimbursed at discounted rates negotiated between the healthcare provider and WellPoint. Services by "out-of-network" providers were reimbursed at a percentage of the lesser of the billed charge or the UCR (or a percentage thereof) for the services in the geographic area in which the services were performed. Any amount charged for ONS beyond the UCR is usually the responsibility of the members. During the time period in question and discussed in further detail below, Plaintiff used ONS that were charged at rates greater than the UCR created and set by WellPoint and its Co-Conspirators, and paid for portions that were not reimbursed by WellPoint.

20.     In making ONS reimbursements, WellPoint uses uniform pricing schedules provided twice yearly by Ingenix, a wholly-owned subsidiary of Defendant UHG, the nation's second largest health insurer (after WellPoint). Ingenix provides this information from a database it creates.

21.     The Ingenix Database is inherently flawed and invalid in that it produces inaccurate uniform pricing schedules, which WellPoint and its Co-Conspirators agree to use for fixing UCRs and under-reimbursing for ONS. The flaws and errors in the Ingenix Database allow WellPoint and its Co-Conspirators to utilize UCRs that are artificially low.

22.     WellPoint is a major contributor of provider charge data to Ingenix. Prior to contributing its data to Ingenix, WellPoint deletes valid high charges and thereby

COMPLAINT

1  does not submit a true range of charges. Following receipt of the data from
2  WellPoint, Ingenix further removes additional valid high charges from WellPoint and
3  all other contributors' data.

4      23.    Ingenix updates its database and disseminates uniform pricing schedules
5  to WellPoint and its Co-Conspirators every six months. Beginning as early as at least
6  1998, WellPoint and its Co-Conspirators used Ingenix pricing schedules to determine
7  reimbursement for ONS.

8      24.    WellPoint and its Co-Conspirators relied on the artificially low UCR
9  pricing schedules to make adverse benefit determinations ("ABDs") with respect to
10 reimbursement for ONS. ABD is purportedly an ERISA term meaning a decision to
11 deny, reduce, terminate, or not pay for all or part of a benefit. WellPoint, as the
12 drafter of the insurance plans subject to ERISA, has the burden to justify any
13 reduction, partial reimbursement, or other exclusion of ONS benefits to members.

14     25.    Moreover, although Plaintiff was, and is, contractually entitled to choose
15 care for ONS, WellPoint inhibited the use of ONS providers by using artificially low
16 UCRs and increasing unpaid amounts for which Plaintiff was liable.

17                                  **PARTIES**
18                                  Plaintiff

19     26.    Plaintiff Michael Roberts (individually and as guardian for his daughter,
20 D. Roberts) is a citizen of the State of California. While insured by WellPoint (Blue
21 Cross of California), Plaintiff received an artificially depressed reimbursement for
22 ONS, resulting in Plaintiff incurring more out-of-pocket expense than he would have
23 absent the unlawful conduct alleged herein.

24                                  Defendants

25     27.    Defendant UnitedHealth Group, Inc. ("UHG") offers, among other
26 things, health insurance products and services and network-based health and well-
27 being services to beneficiaries and other government-sponsored health care programs.
28

COMPLAINT
                                    - 6 -

A Minnesota corporation, UHG's principal place of business is at 9900 Bren Road East, Minnetonka, Minnesota 55343.

28. Defendant Ingenix, Inc. ("Ingenix") is a wholly-owned subsidiary of UHG and offers a comprehensive line of clinical and cost management solutions for health care payers, providers, employers, pharmaceutical manufacturers, government agencies and other requiring quality health care information. The company's products and services are represented by four business groups including: (i) software and data services; (ii) publishing; (iii) pharmaceutical services; and (iv) consulting. Ingenix licenses the use of its proprietary Ingenix Database to insurers who use it to set reimbursement schedules for out-of-network, non-negotiated medical services. A Minnesota corporation, Ingenix's principal place of business is at 12125 Technology Drive, Eden Prairie, Minnesota 55344.

29. Collectively, UHG and Ingenix are sometimes referred to herein as the "UHG Defendants." The UHG Defendants joined the conspiratorial activity alleged herein and are legally responsible for the unlawful conduct because their directors, members, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, the UHG Defendants are legally responsible because they acted through, facilitated, dominated, or controlled the actions of another one of the UHG Defendants in furtherance of the unlawful conspiratorial activity alleged herein.

30. Defendant WellPoint provides health insurance to millions of persons across the United States, including Plaintiff, via its division "Blue Cross of California." An Indiana corporation, WellPoint has its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana 46204, and is licensed to conduct business in all fifty states.

31. Defendant Blue Cross of California is located at 21555 Oxnard Street, Woodland Hills, California, and operates through the trade name Anthem Blue Cross and is a division of Defendant WellPoint. WellPoint, through Blue Cross of

COMPLAINT

- 7 -

California issues the plan member Evidence of Coverage and Disclosure Form that was provided to Plaintiff. Moreover, the Evidence of Coverage and Disclosure Form provides that Blue Cross' customer service departments are located in Oxnard and Los Angeles, California and that the submission of claims must be made to Blue Cross of California's Los Angeles office.

32. WellPoint was created in or around 2004 by the merger of WellPoint Health Networks, Inc. with Anthem, Inc. The merged companies changed their name to WellPoint, Inc. on or about November 30, 2004. As the successor entity to Anthem, Inc., WellPoint, Inc., is liable for Anthem's actions both before and after the merger between the two companies.

33. WellPoint serves customers throughout the United States, including California, under various names such as HealthLink, Unicare, and Blue Cross Blue Shield. WellPoint also serves California insureds through its subsidiary, Blue Cross of California. WellPoint operates, trades or otherwise does business through a variety of subsidiary companies and/or affiliates including, but not limited to, the following:

- Anthem Blue Cross and Blue Shield Plan Administrator, LLC
- Anthem Blue Cross Blue Shield Partnership Plan, Inc.
- Anthem Blue Cross Life and Health Insurance Company
- Anthem Health Plans of Kentucky, Inc., d/b/a/ Anthem Blue Cross and Blue Shield
- Anthem Health Plans of Maine, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Plans of Virginia, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Insurance Companies, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Life Insurance Company

COMPLAINT

- Anthem Life & Disability Insurance Company
- Blue Cross and Blue Shield of Georgia, Inc.
- Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.
- Blue Cross Blue Shield of Wisconsin, d/b/a Anthem Blue Cross and Blue Shield
- Blue Cross of California, d/b/a Anthem Blue Cross
- Blue Cross of California Partnership Plan, Inc., d/b/a Anthem Blue Cross Partnership Plan
- Claim Management Services, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Community Insurance Company, d/b/a Anthem Blue Cross and Blue Shield
- Compcare Health Services Insurance Corporation, d/b/a Anthem Blue Cross and Blue Shield
- Empire HealthChoice Assurance, Inc., d/b/a Empire Blue Cross Blue Shield
- Empire HealthChoice HMO, Inc., d/b/a Empire Blue Cross Blue Shield HMO
- Golden West Health Plan, Inc.
- HealthKeepers, Inc.
- Healthy Alliance Life Insurance Company, d/b/a Anthem Blue Cross and Blue Shield
- HMO Colorado, Inc.
- HMO Colorado, Inc., d/b/a HMO Nevada
- HMO Missouri, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Machigonne, Inc.
- Matthew Thornton Health Plan, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Peninsula Health Care, Inc.
- Priority Health Care, Inc.
- RightCHOICE Managed Care, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield

COMPLAINT

- UNICARE Health Insurance Company of Texas
- UNICARE Health Insurance Company of the Midwest
- UNICARE Health Plan of Kansas, Inc.
- UNICARE Health Plan of West Virginia, Inc.
- UNICARE Health Plans of Texas, Inc.
- UNICARE Health Plans of the Midwest, Inc.
- UniCare Life & Health Insurance Company
- UNICARE of Texas Health Plans, Inc.
- WellChoice Insurance of New Jersey, Inc.

<u>Co-Conspirators</u>

34. Other natural persons, corporations and entities participated as Co-Conspirators, including:

(a) Aetna, Inc. ("Aetna") provides health insurance products and related services, including medical, pharmacy, dental, behavioral health, group life, long-term care and disability plans, and medical management capabilities primarily in the United States. Aetna's Group Insurance segment offers life, disability, and long-term care insurance products. Aetna participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans. A Pennsylvania corporation, Aetna's principal place of business is at 151 Farmington Avenue, Hartford, Connecticut 06156.

(b) Cigna Corporation ("Cigna"), through its subsidiaries, provides healthcare and related benefits in the United States and internationally. Cigna's healthcare segment offers consumer-directed health plans, health maintenance organizations, network only and point-of-service medical plans, preferred provider plans, and traditional medical indemnity coverage. Cigna participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine

COMPLAINT

purportedly UCRs for out-of-network health care services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans. Cigna is headquartered at Two Liberty Place, 1601 Chestnut Street, Philadelphia, Pennsylvania 19192;

(c) Oxford Health Plans' ("Oxford"), a subsidiary of UHG, products include its Freedom Network and Liberty Network HMOs, as well as the Freedom Plan and Liberty Plan point-of-service plans. Oxford participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans. Oxford is headquartered at 48 Monroe Turnpike, Trumbull, Connecticut 06611;

(d) Health Net, Inc. ("Health Net") is among the United States' largest publicly-traded managed healthcare companies. The Company offers, among other things, HMOs, POSs, and insured PPOs. Health Net participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to determine purportedly UCRs for out-of-network health care services and/or by using the UCR produced by Ingenix to pay claims made by insureds under its health plans. The Company's headquarters is located at 21650 Oxnard St., Woodland Hills, California 91367; and

(e) Health Insurance Association of America ("HIAA"), now known as America's Health Insurance Plans ("AHIP") is a trade group for the health insurance industry. It is a national association comprised of a variety of medical entities, but notably major insurance companies, including many of its fellow Co-Conspirators. It proclaims to provide "a unified voice for the community of health insurance plans" by representing the interests of its members on legislative and regulatory issues at the federal and state levels, and by providing conferences and publications. In 1973, HIAA created a database known as the Prevailing Health Charges System ("PHCS") by obtaining historical charge data for surgical and

COMPLAINT

anesthesia procedures from numerous data contributors, including health insurance companies, third-party payors, and self-insured companies. HIAA later expanded PHCS to include data regarding dental (1977), medical (1988), and drugs/medical equipment (1998). HIAA had committees and advisory groups comprised of various insurance company members that were responsible for PHCS's development and management and which caused the PHCS database to become populated with flawed data. In October 1998, HIAA sold PHCS to Ingenix, and PHCS is now part of the Ingenix Database.

35. In addition to Aetna, Cigna, Oxford and Health Net, other health insurance companies, not named as defendants, have participated in the alleged unlawful conspiratorial activity in violation of federal and state law. Such violations include, *inter alia*, knowingly providing flawed and misleading data to Ingenix for use in determining UCRs; knowingly acquiescing to flawed and improper manipulation of data provided by Ingenix; and knowingly using artificially low UCRs produced by Ingenix in determining reimbursements for ONS.

36. Whenever reference is made to an act, statement, or transaction of any corporation or entity in this Complaint, including each of the Defendants and Co-Conspirators, the allegation means that the corporation or entity acted, stated or transacted by or though its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

37. At all times mentioned in the allegations herein, each and every Defendant and Co-Conspirator was an agent or representative of and aided and abetted in the unlawful conduct of each of the other Defendants and Co-Conspirators. In doing the things alleged herein, each and every Defendant and Co-Conspirator was acting within the course of such agency or representation and was acting with the consent, permission and authorization of the other Defendants and Co-Conspirators.

COMPLAINT

1  All actions of each Defendant and Co-Conspirators as alleged herein were ratified and

2  approved by the other Defendants and Co-Conspirators.

3  **INTERSTATE TRADE AND COMMERCE**

4  38.  Relevant to this Complaint, Defendants marketed, distributed, and sold or

5  otherwise provided health insurance coverage, including coverage for ONS, to persons

6  throughout the United States, using the means and instrumentalities of interstate trade

7  and commerce.  Accordingly, Defendants' unlawful activity had a direct, substantial,

8  and reasonably foreseeable effect upon interstate trade and commerce.

9  **RELEVANT PRODUCT MARKET**

10  39.  The relevant product market is the market for data used to calculate

11  UCRs for reimbursement of claims by health insurance beneficiaries for out-of-

12  network, non-negotiated medical services (the "Data Market").  The Data Market is

13  directly linked to, and determines the prices paid, by insured consumers who purchase

14  out-of-network services (the "Linked Market").  The Data Market constitutes the

15  primary input to the Linked Market and is used to effectively control and depress

16  amounts reimbursed in that market.  Once adopted, the UCR constitutes the critical

17  element in the reimbursement formula applied under each insurance plan and operates

18  as a ceiling to cap the amount that will be reimbursed to the insured consumer.  By

19  agreeing to joint control and administration of the Data Market, WellPoint and its Co-

20  Conspirators are able to assure that prices paid (*i.e.*, reimbursements) for ONS

21  services will be artificially depressed, leading to collective cost-savings for WellPoint,

22  UHG, and their Co-Conspirators and increased costs borne by insured consumers who

23  are the purchasers of those ONS services.

24  40.  The relevant geographic market is the United States.

25  41.  Ingenix, UHG, WellPoint and their Co-Conspirators jointly produce this

26  service.  Ingenix compiles and administers the Ingenix Database while UHG,

27  WellPoint and their Co-Conspirators provide the raw data necessary for the Ingenix

28  Database, as the benchmark for UCRs setting reimbursement for ONS.

COMPLAINT

42.     Today, the vast majority of health insurers have agreed to use the Ingenix Database to determine UCRs for reimbursing ONS claims.   Indeed, the UHG Defendants promote the Ingenix Database as the "industry standard" for determining UCRs, which insurance companies use to imbue their artificially low reimbursements for ONS with the appearance of legitimacy and accuracy.

43.     The market for the provision of data used to calculate UCRs for reimbursement of claims by health insurance beneficiaries for out-of-network, non-negotiated medical services is conducive to the collusion alleged herein.

44.     The relevant market has high barriers to entry.  The high barriers to entry include:  the costs of obtaining historical and current insurers' data; the costs of constructing, developing, and maintaining hardware and software platforms necessary to aggregate, manipulate, and disseminate the data; and the costs of successfully marketing insurers to adopt the services.

45.     The cost and difficulty of obtaining historical data poses an exceedingly high barrier to entry, as it requires any new entrant to obtain such data from Ingenix, who controls the spectrum of relevant historical insurer data.

46.     The market for the provision of data to calculate UCRs for reimbursement of claims by health insurance beneficiaries for out-of-network, non-negotiated medical services is a mature market, having been in existence for decades. There are few competitors and, as described herein, the market has been marked by consolidation among the competitors, such that Ingenix now provides the vast majority of data in this market.

47.     Defendants and their Co-Conspirators had, and continue to have, ample opportunities to communicate among themselves about the conspiracy and combination alleged herein, including the collection and dissemination of data used to establish the UCRs for calculating reimbursement for ONS, as well as at HIAA and now AHIP board meetings where Defendant WellPoint was, and is, a board member. Indeed, under the terms of the licensing agreements that govern the use of the Ingenix

COMPLAINT

Database, UHG, WellPoint and their insurance company Co-Conspirators are in almost constant communication with Ingenix.

48.     Given the existence of the conspiracy, it is in WellPoint's and its Co-Conspirators' collective interest to conspire to provide inaccurate, artificially low health care provider charge information to Ingenix for use in its database. As cartel members, it is contrary to their collective interests to provide accurate reimbursement rates because each of the Co-Conspirators uses the Ingenix Database for the calculation of reimbursement of ONS. If any Co-Conspirator were to cheat on the cartel and provide transparent pricing information that accurately reported healthcare provider charges, that accurate information would precipitate competition for ONS reimbursement, resulting in a loss of market share, revenue, and customers by cartel members.

49.     Were it not for the existence of the conspiracy, WellPoint and its Co-Conspirators would each have an incentive to set UCRs accurately and competitively in order to make their insurance products incorporating ONS coverage more attractive and thus sell a larger number of policies. Their failure to do so is an action against individual self-interest but in favor of their collective conspiratorial interest and provides further evidence of the conspiracy. In purchasing health insurance products, consumers are able to compare virtually all plan provisions to determine which offers the most attractive mix of benefits. Indeed, plans are routinely compared based upon co-pay levels, deductibles, out-of-pocket maximums, numbers of covered visits, pre-existing condition coverage, drug benefits, availability of psychiatric care and numerous other provisions. But when it comes to UCRs, WellPoint and its Co-Conspirators hide their price terms. WellPoint and its Co-Conspirators provide no information about either the amount of their established UCRs, the relationship between those UCRs and amounts actually charged by health care providers in the consumer's locale, or the fact that UCRs are set in cooperation with other insurers through the use of a shared platform. Instead of providing such information, which

COMPLAINT

would allow consumers to compare the value of ONS benefits in the same way they compare other plan provisions, WellPoint and its Co-Conspirators routinely mislead consumers by including language to the effect that reimbursement will be based on the lesser of the UCR or the actual charge imposed by the health care provider, when they are aware that the UCR will almost always be far lower.

50.     Due to the lack of transparency in the determination of UCRs and ONS reimbursement as alleged herein, as well as a non-disclosure agreement by WellPoint and its Co-Conspirators not to provide data to potential competitors of Ingenix, there is no competition among WellPoint or its Co-Conspirators with respect to determination of UCRs or the reimbursement of ONS. Members of WellPoint health plans and ONS providers have no reasonable alternative other than to accept whatever ONS reimbursement is offered by WellPoint and its Co-Conspirators.

## WELLPOINT PLANS PROVIDE COVERAGE FOR OUT-OF-NETWORK SERVICES

51.     WellPoint issues EOCs to Plaintiff and all its participants and beneficiaries ("WellPoint plan members") that set forth the benefits that WellPoint promises to pay its members. According to Plaintiff's EOC, benefits were to be conferred for the subscriber and his enrolled family members.

52.     Like most insurance plans, WellPoint's plans typically differentiate between: (i) coverage for medical treatment from "in-network" providers who have negotiated discount rates with the insurer; and (ii) coverage for treatment from "out-of-network" providers who charge insureds their usual, non-discounted rates. Health insurance plans, as part of their contracts with in-network providers, preclude in-network providers from billing insured patients in excess of the contracted for in-network services. Conversely, out-of network providers have no service contracts with the insurance company and thus are not precluded from billing at their usual rates. In cases where the out-of-network provider bills in excess of what the insurance

company is willing to pay, the balance not paid by the insurance company is the responsibility of the WellPoint plan member.

53.     Under Plaintiff's WellPoint plan, plan members have an express right to receive treatment from providers who have not entered into contracts with WellPoint as to the fees they will accept. WellPoint refers to these providers as "non-participating," "non-contracting," "non-network," and/or "out-of-network" providers. When WellPoint plan members receive ONS, WellPoint's payment is based on a percentage of the lesser of the billed charge or what WellPoint describes as the "usual and customary" rate for that service. WellPoint uses the terms "UCR," "usual and customary" and "reasonable charge" interchangeably.

54.     WellPoint often refers to the UCR as the "amount allowed" or "allowable charge." WellPoint makes clear in its EOCs, as well as in other written communications with its plan members, that the plan member is financially responsible for the difference between the UCR (amount allowed) and the provider's billed charge for ONS. For example, some of WellPoint's EOCs for ONS state the amount the out-of-network provider charged for the service, the amount allowed, and after stating the percentage and portion of the amount allowed that WellPoint will pay, states the balance, which it describes as "Your Responsibility." Other EOCs refer to this amount as "What You May Owe Providers" or use similar language conveying WellPoint's position that the portion of an ONS that WellPoint has not paid is the plan member's obligation.

55.     The portions of ONS charges not paid by WellPoint are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan member has to pay for medical services over a given time period.

56.     In processing claims for ONS charges, WellPoint is obligated under ERISA to calculate accurate UCRs and reimburse its plan members based on accurate UCRs, in a manner consistent with the definition of UCR that WellPoint uses in

COMPLAINT

describing its health plans to its plan members. WellPoint, however, fails to comply with its own UCR definition by failing to pay benefits based on accurate UCRs.

## PLAINTIFF SUBMITTED CLAIMS TO WELLPOINT FOR OUT-OF-NETWORK SERVICE CHARGES

57.     Plaintiff Michael A. Roberts (individually, and as guardian for D. Roberts) alleges that WellPoint breached its fiduciary duties under ERISA, for which he seeks equitable relief.  He further seeks unpaid benefits from WellPoint for the reduced UCR payment described below for which he exhausted his administrative remedies.

58.     Plaintiff's daughter, D. Roberts, during the Relevant Time Period, was either under the age of 19 or a full-time student attending an accredited college in the state of Massachusetts.  Plaintiff submitted the requisite written certification of student status to WellPoint.  Plaintiff's daughter was thus directly insured under Plaintiff's plan.

59.     Plaintiff's employer sponsored an "EmployeeElect Medical Plan" for its employees, including Plaintiff Michael Roberts, which was directly insured by WellPoint (via Blue Cross of California).  Plaintiff and his family were thereby directly insured by WellPoint under this Plan during the Relevant Time Period and contributed to the cost of the premiums for their group health plan.

60.     Upon subscribing to his employer-sponsored plan, Plaintiff received his "Combined Evidence of Coverage and Disclosure Form" (the "EOC").  The document states that Plaintiff and his eligible family members are directly insured under the Plan and lists within "family member" any children of the Plaintiff including:

> Unmarried children of the Subscriber, the Subscriber's enrolled Spouse, or the Subscriber's enrolled Domestic Partner from the nineteenth (19th) to twenty-fourth (24th) birthday who qualify as dependents for federal income tax purposes and who are full-time students (for twelve (12) or more credits) attending an accredited college, university, vocational or technical school.  Blue Cross requires written proof of student status annually.

COMPLAINT

61. Plaintiff's EOC specifies that there is a set deductible, and that once this deductible is satisfied, WellPoint is required to reimburse its subscribers, including Plaintiff, according to a chart contained within the EOC. Pursuant to the chart, medical procedures are classified as either being undertaken by a participating provider or by a non-participating provider. "Non-Participating Provider" is defined as an entity (hospital, physician or otherwise) "which does NOT have a Prudent Buyer Plan Participating Provider agreement with Blue Cross in effect at the time services are rendered . . . ."

62. The chart in the EOC contains various medical procedures and the corresponding reimbursement amounts/subscriber payment responsibility. As an example, the EOC lists "Outpatient Hospital and Emergency Room" procedures at a non-participating provider (in or out of the State of California) and allows that the consumer, Plaintiff, must pay "40% of the Customary and Reasonable charge . . . ." Therefore, WellPoint will pay the remaining 60% of the Customary and Reasonable charge.

63. The EOC defines "Customary and Reasonable Charge" as "the average price that a majority of providers charge for a particular procedure, supply, piece of equipment or service, based on where the procedure, supply, piece of equipment or service is performed or obtained."

64. On or about December 4, 2007, Plaintiff's daughter underwent an outpatient hospital procedure at a Non-Participating Provider hospital. Plaintiff submitted a claim with WellPoint regarding this procedure. WellPoint made a UCR determination on this claim that reimbursed Plaintiff less that the stated percentage of the provider's actual charges. This UCR determination resulted in Plaintiff being obligated to pay not only his deductible, but also that part of the provider's billed charge that exceeded the UCR amount as determined by WellPoint.

COMPLAINT

65. WellPoint failed to comply with the terms of Plaintiff's group plan by making a UCR determination that reduced the stated percentage of the provider's charges without valid data to support such a determination.

66. Plaintiff specifically requested relief from WellPoint regarding this claim on May 12, 2008 and thereby appealed the decision, exhausting his administrative remedies. Plaintiff did not receive data, documentation, or adequate redress, and continues to be liable for the remainder of the medical bill (to the tune of thousands of dollars).

67. Plaintiff, in writing or otherwise, repeatedly requested that WellPoint provide specifics about the UCR determination and about why the provider's charges had been determined to exceed the UCR. However, WellPoint never provided any data or other documentation for its UCR determination.

68. WellPoint failed to comply with the terms of Plaintiff's plan by making UCR determinations that had the effect of covering less than the stated percentage of providers' charges without valid data to support such determinations.

69. As a consequence of WellPoint's action, Plaintiff (and members of the proposed Class) was reimbursed in amounts less than what he should have been paid under his health plan. WellPoint pursued its standard and uniform policies in making UCR determinations in a fashion that conflicted with its contractual obligations under Plaintiff's plan, that violated its fiduciary duties to Plaintiff and, in addition, WellPoint misrepresented to Plaintiff and its other subscribers that the UCR amounts were calculated on the basis of valid data.

## THE INGENIX DATABASE: ANATOMY OF A CONSPIRACY

70. Ingenix is a self-styled nationwide "health care information company" that sells "customized fee analyzers" to medical providers, healthcare insurers and automobile liability insurance companies. Essentially, Ingenix creates "modules" or

COMPLAINT

uniform pricing schedules, which provide whole dollar payment amounts for each percentile (for instance, the 80th percentile) for given medical procedures in various locations. All users of the database, *i.e.*, WellPoint and its Co-Conspirators, are given precisely the same dollar amounts by percentile for each particular procedure and area.

71.     The Ingenix Database is marketed by the UHG Defendants as the "industry standard." Defendants UHG and WellPoint, as well as the Co-Conspirators, all use the same Ingenix-established UCRs to reimburse for ONS.

72.     To create the database, Ingenix first enters into contracts/licensing agreements with health insurers, including Defendants WellPoint and UHG, as well as the Co-Conspirators, to (i) obtain data surrounding billing rates and information *from* those health insurers; and/or to (ii) provide UCR uniform pricing schedules *to* those same health insurers, including Defendants UHG and WellPoint, for their use in billing ONS. Ingenix actually offers the Ingenix Database to health insurers at a discounted rate if those insurers agree to provide data to Ingenix to create that very database. WellPoint both provides to and receives from Ingenix pricing data used to set UCRs and reimbursement for ONS.

73.     For the creation and continued updating of its database, Ingenix relies entirely on accumulating data from its various information providers (including Defendants and their Co-Conspirators) via its "data contribution program" in which those health insurers that are Ingenix clients submit information about the amounts they happen to have been billed by an undisclosed number of unidentified health care providers for specific "CPT" code services. Current Procedure Terminology ("CPT") codes are a system by which the American Medical Association categorizes all medical services by five-digit codes. The data Ingenix receives has been termed a "convenience sample."

74.     Following treatment by an out-of-network provider, that provider submits a standardized claims procedure form to WellPoint; WellPoint then extracts

COMPLAINT

information from that form to submit to Ingenix. However, the only information provided from the claims form to Ingenix are the following four points: (i) the date of service; (ii) the CPT code; (iii) the zip code where the service was provided; and (iv) the actual amount billed.

75. In or around 2005, members of HIAA discussed submitting more than these four data points to Ingenix because they recognized expressly that the four data points were limited and inadequate as a basis for calculating accurate UCRs. Potential data points included provider identification, licensure, specialty, patient age and gender, and type of facility where the service was provided.

76. Despite this express acknowledgement that the four data points were limited and inadequate, Defendants and the Co-Conspirators opted to continue to only submit the four above-listed elements to Ingenix. Furthermore, WellPoint never advised its members of the inadequacy of the four data points or of the failure to expand those data points.

77. Health insurers thus continue to enter these four simple data points onto a standard claims submission form provided to Ingenix. However, prior to submission to Ingenix, health insurers first "scrub" these claims submissions forms in order to remove the highest charges, thereby submitting only the lowest claims amounts which results in a lower average cost.

78. Therefore, WellPoint, UHG, and the Co-Conspirators all affirmatively manipulate the data they contribute to Ingenix so as to further ensure that the Ingenix Database reports invalid and artificially low UCRs.

79. Furthermore, in 2005, Ingenix changed its data contribution forms to require data contributors to certify with each submission that the contributed data was complete and was not pre-edited or otherwise manipulated. At this point, WellPoint began to provide those required certifications to Ingenix attesting to the fact that its data submission was complete and not pre-edited. WellPoint knew and continues to know that the certifications are false and misleading.

COMPLAINT

80. Once Ingenix receives the data contribution forms (containing only the four data points), it is then able to combine information from all the contributors (including Defendants and the Co-Conspirators) to create the Ingenix Database used to calculate UCRs for ONS.

81. Because it only receives the four data points on the data contribution forms, Ingenix necessarily uses only those four elements (date of service, CPT code, address, and amount billed) to create the Ingenix Database. These four data points do not identify the provider, the patient (including age and condition), the type of facility where the services was performed, any adjustment factors for cost of living, whether physicians or non-physicians performed the services, the provider's usual charge and licensure, the type of facility where the service was performed (*i.e.*, hospital, clinic, doctor's office, nursing home, intensive care unit), or the prevailing fee or charge level for any provider or service in a particular geographic region.

82. In fact, Ingenix actually further ***decreases*** the amount of specificity provided on the data contribution forms by removing any "modifiers" contained on those forms. Modifiers consist of a two-digit number that providers add to a five-digit CPT code to signify an alteration of the stated service or otherwise identify the circumstances in which the service was provided. Modifiers may be used, for example, to indicate that a non-physician has provided the service. In such a situation, the charge would be less than what a physician would normally charge for such a service. Once Ingenix removes a modifier, though, the number is given equal weight as a physician's charge in order to determine the UCR for that service.

83. The Ingenix Database also does not tabulate data according to the specific geographic area where a UCR actually would apply. Instead, Ingenix divides all states into "geo-zips" composed of cities and towns sharing three-digits of postal zip codes, which are then grouped together by not only geographical proximity, but also by what Ingenix arbitrarily decides are "data similarities." These geo-zips are not medical service areas amendable to cost comparison.

COMPLAINT

84. The distortions created by the use of the geo-zips are recognized by Ingenix itself. In one of its Customized Fee Analyzers provided to health insurers, Ingenix states that:

> Because the fee ranges in the Analyzer are based on the first three digits of your geo-zip, you need to assess where your locale stands in relation to others in this three-digit area. For example, many different three digit areas contain both urban and rural locales with different charging patterns. Use your judgment to determine how to interpret the fee range for your particular community.

85. WellPoint, UHG and the Co-Conspirators fail to exercise reasonable judgment in determining whether the specific geo-zip applicable to a particular UCR determination is valid, including whether it may contain "urban and rural locales with different charging patterns." Instead, WellPoint relies strictly on the geographic groupings provided by the Ingenix Database without taking into account possible different charging patterns within each geo-zip. By doing so, WellPoint's UCRs have no valid basis, do not comply with its plan documents, are unreasonable, and violate applicable law.

86. Once Ingenix receives data contribution forms from individual insurers (which those insurers themselves have already scrubbed), it further edits the pooled data to remove high end values but not low end outliers. Ingenix does so by using formulaic edits to identify purported statistical outliers and automatically removes them without factual basis or further investigation to determine if they are truly incorrect data points (and should be removed) or are simply valid high charges. The incorrect removal of valid high charges biases the upper percentile values downward.

87. Based upon these procedures, Ingenix then produces two cycles of uniform pricing schedules a year that include medical, surgical, anesthesia, and coding system service rates for a given geographic area and CPT code. Once WellPoint receives these uniform pricing schedules, they are uploaded onto a computerized claims platform and automatically accessed to determine UCRs for ONS.

COMPLAINT

88. WellPoint's computer system automatically adjudicates claims for the vast majority of ONS claims. In other words, the Ingenix Database is automatically applied and no human intervention is necessary to evaluate the individual claims or the accuracy of the UCR provided by Ingenix.

89. WellPoint uses the information received from Ingenix to determine UCRs for ONS even though Ingenix broadcasts that it is not endorsing, approving or recommending the use of the Ingenix data for UCRs. With each production, Ingenix includes the following disclaimer:

> The Ingenix data are provided to subscribers for informational purposes only. Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data. There is neither a stated nor an implied "reasonable and customary charge . . . .

90. Despite this disclaimer, Ingenix continues to enter into agreements with Defendants and the Co-Conspirators whereby the Ingenix Database is used to calculate UCRs for ONS, which turn out to be artificially low. Indeed, UHG and Ingenix promise that Ingenix Database users, including WellPoint and the Co-Conspirators, will achieve substantial savings, including a 16:1 return on investment.

91. There is no review procedure in place at WellPoint to verify the accuracy of the twice-yearly uniform pricing schedules generated by the Ingenix Database. Instead, the uniform pricing schedules created by the Ingenix Database are automatically relied upon to determine UCRs despite the fact that Ingenix actually informs insurance companies that it is not endorsing, approving or recommending use of it to determine UCRs.

92. Likewise, Ingenix cannot guarantee that all claims received for a particular CPT code service at any given time have been reported, much less accurately reported, by its contributing insurers. Nor can Ingenix ascertain if the bills that are listed constitute the unnamed providers' usual and customary charges for the service, or, instead, a discounted rate required by the agreements one or more of the providers may have had with health care insurers. While Ingenix requests that the

COMPLAINT

CPT code billing data be accurate and complete, Ingenix remains "at the mercy" of its data contributors with respect to that result because there is no Ingenix mechanism to enforce or validate the client certificates.

93.     Ingenix has never tested its results to determine if its statistical conclusions bear any relationship to the actual high, low, median or 80th percentile of actual marketplace CPT code service rates charged by health providers in any given area.

94.     The end result of this cycle of collusion is a database that produces flawed uniform pricing schedules (effectively UCRs) that systematically result in the under-reimbursement for ONS by WellPoint and its Co-Conspirators.  The flaws in the database are pervasive and include:

    (a)    questionable accuracy of underlying data;

    (b)    no inquiry into whether all of the contributors are using the same criteria and coding (as well as aggregating) accurately and consistently;

    (c)    a procedure whereby when there is not enough charge data to provide a statistically valid sample for a CPT code, Ingenix aggregates data from similar codes to create a large enough sample;

    (d)    Ingenix itself combines geo-zips to determines what it considers to be a "sociodemographic region" and there is no verification for such regions;

    (e)    Ingenix scrubs data but only removes outliers in a subjective manner, i.e., removes high-end values but not low-end outliers;

    (f)    No appropriate statistical methodology (including sampling, data editing or data estimation) and as a result, data is inappropriate and biased downward;

    (g)    the cumulated data that Ingenix has received has already been scrubbed by the individual contributors;

    (h)    includes charges for procedures in non-comparable geographic area;

COMPLAINT

1         (i)    does not segregate procedures performed by providers or same or

2    similar skill, but combines all CPT codes together;

3         (j)    combines ONS charges with "in-network" providers who have

4    already agreed to a contracted rate – thus skews it downward;

5         (k)    fails to distinguish between the number of medical providers

6    whose charges are reflected; and

7         (l)    does not edit any data that reflects negotiated or discounted

8    charges.

## THE CONSPIRACY TO CREATE AND FIX UCRs FOR THE PURPOSE OF UNDER-REIMBURSING FOR ONS

95.    The fundamental roots of the Ingenix Database lie in what is known as the Prevailing Healthcare Charge System (the "PHCS") database.

96.    The PHCS was initially created by HIAA, the health insurance industry's main trade association.

97.    HIAA, now known as America's Health Insurance Plans ("AHIP"), markets itself as a national association representing providers of health benefits in order to advocate on behalf of health insurance plans and to represent the interests of its members so as to "provide a unified voice for the healthcare financing industry . . . ."

98.    Those members included, and continue to include, virtually every major health insurer. In fact, at the time of drafting this complaint, the Board of Directors of AHIP includes executives of Defendants and the Co-Conspirators, including, but not limited to, the President and CEO of WellPoint and at least two executive vice presidents at UHG.

99.    More specifically, various committees within HIAA initially developed and managed the PHCS database – those members made decisions concerning the operation and very design of the database.

COMPLAINT

100. HIAA initially created the PHCS as a way to aggregate and compile physician charge data as a service to its members.

101. HIAA compiled information from its vast pool of member/insurers to create the PHCS which initially pertained to surgical and anesthesia procedures, but within five years of its inception in 1973, began to also include dental, medical, and drugs/medical equipment rates.

102. Once created, the PHCS became the largest pool of charges for medical services in the country and was considered to be the nation's most comprehensive database of provider charges for private health care services – *i.e.*, the rates charged by physicians and other private healthcare providers. It contained data from more than 150 contributors from 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands.

103. The information HIAA compiled (collected from the members/insurers), however, consisted only of four data points: the date of service, the CPT Code, the billed charge, and the geo-zip. This was the only information that HIAA sought from its members to create the PHCS.

104. In fact, HIAA (via its committees and Board of Directors) consciously decided to limit the amount of information it received from contributors to create the PHCS. In its own documents, HIAA stated that the data was limited and that even the quality of the data was "questionable."

105. Once HIAA obtained the "questionable" data, it compiled the various submissions and created the PHCS which it then submitted to its members as a service. However, HIAA expressly informed insurers that the PHCS was ***not intended to be used to establish UCRs.***

106. The PHCS, thus, was built on submissions from health insurance companies but was not designed to determine precise reimbursement amounts – only to provide a general idea about prevailing charges in a given area based upon the admittedly limited data that HIAA collected in order to initially create the PHCS.

COMPLAINT

107.  HIAA submitted a disclaimer with the data it provided via the PHCS:

> The DATA, whether actual charge data, derived charge data conversion factor data or length of stay data, are provided to the LICENSEE for information purposes only.  The HIAA disclaims any endorsement, approval or recommendation of the DATA.  There is neither a stated nor an implied "reasonable and customary" charge, either actual or derived; neither is there a stated nor an implied "reasonable and customary" conversion factor or length of stay.  Any interpretation and/or use of the DATA by the LICENSEE is solely and exclusively at the discretion of the LICENSEE. THE LICENSEE MUST *NOT* represent the DATA in any way other than as expressed in this paragraph.

108.  In October 1998, the members of HIAA (including WellPoint) agreed to sell the PHCS to Ingenix for an undisclosed amount.  This was part of a plan by Ingenix to acquire a dominant position in the market for the provision of date services used to calculate UCR that included over 50 acquisitions.  Prior to the PHCS purchase, in December 1997, Ingenix purchased the "MDR Price Management" ("MDR") database for derived data from Medicode, Inc.  Ingenix would later merge those two databases to form what has herein been referred to as the Ingenix Database.

109.  Under the terms of the 1998 sale, HIAA and Ingenix agreed to have member companies participate on an ongoing Ingenix PHCS Advisory Committee, which would have input into what and how data were used by Ingenix, of which WellPoint is a member.  Additionally, all HIAA staffers who then worked on the PHCS were offered positions with Ingenix.

110.  Furthermore, accompanying the sale to Ingenix, HIAA and Ingenix agreed to a 10-year Cooperation Agreement which provided HIAA with continued input in the development and operation of the PHCS and provided for lasting co-mingling of the two entities in the form of a "Liaison Committee" to advise and evaluate Ingenix.

111.  The Cooperation Agreement further provided that Ingenix would charge HIAA members 50% less than non-HIAA members for use of the database *and* that Ingenix would waive all fees for HIAA members that contributed data.

COMPLAINT

112. Ingenix, upon purchasing the PHCS, also entered into a Confidentiality Agreement mandating that it shield from disclosure the identity of entities (*i.e.*, the Defendants and Co-Conspirators in this action) that had or would submit information for use in the database.

113. At the time of the sale of the PHCS to Ingenix, and as a condition thereto, UHG agreed to become a member of HIAA.

114. This chain of events serves to demonstrate how Defendants, through HIAA, conspired and agreed to create, expand, continue, promote and use the Ingenix Database to control and set UCRs among and between WellPoint and its purported horizontal competitors with the ultimate aim of setting ONS reimbursements at below market levels.

115. The agreement by WellPoint and its Co-Conspirators with Ingenix to create and control the data used to establish UCRs persists to the present.

116. Based on its agreement with HIAA in 1998 and continuing today, Ingenix gives discounts to WellPoint and its Co-Conspirators for supplying it with the pricing data it scrubs to fabricate UCRs.

117. UHG, WellPoint and the Co-Conspirators each contract with Ingenix to ensure the creation and provision of UCRs that they use to under-reimburse for ONS.

118. Under the agreements, UHG, WellPoint and the Co-Conspirators provide pricing data to Ingenix. Ingenix in turn combines the pricing data it receives from WellPoint and its Co-Conspirators.

119. As a condition of obtaining uniform pricing schedules from Ingenix, Ingenix and the Defendants as well as the Co-Conspirators also enter into confidentiality and non-disclosure agreements whereby WellPoint and its Co-Conspirator insurers agree not to re-produce any of the data submitted to Ingenix to any other group that seeks to develop a competing database for use in determining UCRs for ONS. These confidentiality and non-disclosure agreements restrain

COMPLAINT

potential competition in the relevant market, and help conceal the agreement to fix prices as well as the role each Defendant and Co-Conspirator has in that agreement.

120.   The Ingenix Database is promoted as the "industry standard," and Defendants UHG and WellPoint, as well as the Co-Conspirators, all use the same Ingenix-established UCRs to reimburse for ONS.

121.   WellPoint and its Co-Conspirators have ample opportunity to, and do, communicate through HIAA (now AHIP where WellPoint is a board member) and regularly share UCR pricing information using Ingenix as a conduit and switch.

122.   In return, Ingenix gives each of the Defendants and Co-Conspirators a database of UCRs based on their combined pricing data.

123.   WellPoint and its Co-Conspirators know the data being provided to Ingenix is flawed and have communicated this fact to one another and Ingenix.

124.   WellPoint and its Co-Conspirators likewise understand the UCRs received from Ingenix are flawed and cause them to under-reimburse for ONS.

125.   WellPoint and its Co-Conspirators continue to have input in type of data used by Ingenix and to jointly produce UCR data and UCRs with and through Ingenix.

126.   WellPoint and each of the Co-Conspirators continue to use Ingenix-created UCRs, essentially a centrally set pricing schedule, as the basis for calculating ONS reimbursement.

127.   In or around 2005, HIAA considered adding data elements to data submitted and used by Ingenix to create UCRs.  Ultimately, WellPoint and its Co-Conspirators understood and agreed that Ingenix would continue to base UCRs on the same insufficient data points it had always been using.

128.   Ingenix informs WellPoint and its Co-Conspirators that it does not endorse, approve or recommend the use of its data for setting UCRs to calculate ONS. Nonetheless, Ingenix provides WellPoint and its Co-Conspirators a uniform pricing schedule (*i.e.*, UCRs) twice a year and promises them a 16:1 return on investment

COMPLAINT

1  when using Ingenix.  The only purpose of the uniform pricing schedule is to set and
2  fix artificially low rates for ONS reimbursement.

3      129.  In order to prevent transparency and inhibit price competition, neither
4  WellPoint nor any of its Co-Conspirators use the publically available and transparent
5  Medicare/Medicaid fee schedule to establish UCRs for reimbursing ONS though this
6  information is publicly available and free of charge.  If WellPoint and its Co-
7  Conspirators had used the Medicare/Medicaid fee schedule for reimbursement of
8  ONS, consumers, including Plaintiff, could have made the decision about which
9  insurer to obtain coverage based on price – which today is impossible due to the
10 opacity of the Ingenix uniform fee schedule.

11     130.  Neither WellPoint nor any of its Co-Conspirators attempted to set up a
12 rival database despite Ingenix's profitability and the fact it is owned by a competitor.
13 Ingenix's profit margins are 20%, compared to 10% for UHG as a whole.  None of the
14 Co-Conspirators attempted to disclose what the basis of their UCRs were nor did they
15 reveal that they, along with other horizontal competitors were supplying and using
16 faulty data.

17     131.  In order to prevent transparency and inhibit price competition, neither
18 WellPoint nor any of its Co-Conspirators disclose to Plaintiff or the general public
19 that they contract with Ingenix, provide Ingenix with data, and use UCRs provided by
20 Ingenix.  They do not disclose how they and Ingenix arrive at UCRs, or that Ingenix
21 disseminates the UCRs they all use for calculating ONS reimbursement.  They do not
22 disclose they have agreed not to provide data to potential competitors of Ingenix.

23     132.  WellPoint and its Co-Conspirators' scheme to manipulate UCRs for the
24 purpose of under-reimbursing for ONS is predicated, in part, on keeping the Ingenix
25 Database, and its inherent flaws, a complete secret from Plaintiff and the Classes.  As
26 a result, WellPoint and its Co-Conspirators actively conceal the true UCRs from
27 Plaintiff and the Classes, knowing the success of the scheme will be jeopardized if any
28 one of them discloses the true UCRs.

COMPLAINT

133. Rather than disclose the defective nature of the Ingenix Database and the participation by WellPoint and its Co-Conspirators in creating flawed UCRs, WellPoint and its Co-Conspirators shield these facts from Plaintiff and the Classes and through misrepresentations and material omissions lead them to believe they are using fair and accurate UCR schedules to reimburse for ONS.

### ANTICOMPETITIVE HARM

134. WellPoint and its Co-Conspirators conspired in the market for the provision of data services used to calculate UCRs in order to create and fix UCRs to artificially depress reimbursement for ONS. Ingenix functions as the conduit and switch WellPoint and its Co-Conspirators use to share prices and ultimately to fix UCRs. The design and effect of the conspiracy is to artificially restrain reimbursement amounts for ONS. As a result of the conspiracy, WellPoint and its Co-Conspirators have shifted the costs of providing health insurance to Plaintiff and the Classes.

135. WellPoint and its Co-Conspirators agreed through contracts, licenses and oral understandings to provide pricing information to Ingenix and to obtain and use the resulting flawed Ingenix uniform pricing schedules to set ONS reimbursement, thereby depriving Plaintiff and the Class of a competitive market for obtaining ONS.

136. Further, Defendants and their Co-Conspirators agreed not to produce data to any other entity that would seek to provide data services used to calculate UCRs used to determine ONS reimbursement.

137. Given Ingenix's 80% market share, the sale of the PCHS database by HIAA, as well as agreements by WellPoint and the Co-Conspirators that tie them to Ingenix, there is no viable competitor in the market for data services used to calculate UCRs.

138. Due to the agreement by Defendants and their Co-Conspirators to manipulate and use a limited number of data points which are used to set the uniform pricing schedules (UCRs) which Ingenix disseminates and WellPoint and others

COMPLAINT

deploy, competition in the market for the provision of data services used to calculate UCRs is harmed by this systematic manipulation of data. In turn, competition in the inextricably linked market for the provision of ONS is harmed because of the agreement by WellPoint and its Co-Conspirators to use the flawed UCRs in order to reimburse for ONS.

139. As a result of the anticompetitive and deceptive conduct of WellPoint and its Co-Conspirators alleged herein, resulting in artificially low UCRs and depressed ONS reimbursements, Plaintiff and the Classes pay more for ONS than they would have in a competitive market.

**NEW YORK ATTORNEY GENERAL INVESTIGATION AND ACTION**

140. During 2007 and 2008, the New York Attorney General received complaints that consumers did not understand how health insurers computed reimbursement rates for ONS and that questioned the amount of reimbursements they were receiving.

141. Accordingly, on February 13, 2008, the New York Attorney General "Healthcare Industry Taskforce" launched an industry-wide investigation into allegations that insurers were under-reimbursing for ONS. The investigation centered on Defendants and the Co-Conspirators, and particularly on Ingenix.

142. After six months of investigation that included document review, data analysis, and interviews, the New York Attorney General found that the Ingenix Database systematically reduces the rate at which insurers paid consumers or their physicians for out-of-network care. As a result, the New York Attorney General's office expanded its investigation by issuing subpoenas to more than a dozen health insurers, including Defendants UHG and WellPoint as well as several of the Co-Conspirators, seeking documents.

143. The New York Attorney General found that those documents revealed a shocking lack of transparency and accuracy in the industry use of the Ingenix Database in that insurers such as WellPoint obfuscate in their policy language by

COMPLAINT

promising to reimburse based on usual and customary rates but then reimburse based on schedules compiled by one of their own: UHG via Ingenix.

144. The New York Attorney General further found that this conflict of interest is entirely hidden from consumers because Defendants and the Co-Conspirators pretend that an independent database underlies their UCRs for ONS when, in reality, the schedules themselves, created in a well of conflicts, are unreliable and inadequate. The end result is that consumers are "tricked" into having to pay more for medical care than they had anticipated, leading to unexpected health care debts.

145. The New York Attorney General found that the health insurers, who have a financial incentive to do so, first provide flawed data and then receive flawed data to determine UCRs for ONS that are understated and artificially low. Or, as the head of the New York Attorney General's investigative task force stated, "garbage in, garbage out."

146. To test the accuracy of the Ingenix Database, the New York Attorney General's office collected and analyzed millions of health care bills from a variety of sources, including over a million bills from ordinary doctors' office visits within the state of New York. It then compared these actual bills to the UCRs produced by the Ingenix Database to be for that geographic area. This enabled the New York Attorney General's office to compare the rate the Ingenix Database indicated *should* be paid with the rate that the doctors actually charged. The comparison ultimately revealed that insurers systematically under-reimburse insureds for doctors' office visits, and that up to 110 million Americans were affected by this issue to the tune of hundreds of millions of dollars in losses for consumers nation-wide.

147. Once it completed its investigation, the AG office issued a document entitled "Health Care Report: The Consumer Reimbursement System is Code Blue" on January 13, 2009 (the "NYAG Report"). That document lays out the central findings of the New York Attorney General investigation.

COMPLAINT

148. The NYAG Report found that the Ingenix Database and the insurers' participation in and use of Ingenix was:

      (a) "an industry-wide problem";

      (b) "a ***rigged system***";

      (c) "fraudulent";

      (d) advanced the interests of the insurers;

      (e) "critically ill"; and

      (f) operated as a "***black box***" to consumers, who are left in the dark as to "what reimbursement rate to expect from the insurer."

149. Furthermore, the New York Attorney General left little doubt that this industry-wide problem needed an industry-wide solution because all industry members benefitted unfairly and at the expense of consumers at least over the past ten years.

150. Following issuance of its Report, the New York Attorney General entered into several "Assurances of Discontinuance" with UHG, WellPoint, and certain of the Co-Conspirators named in this case (Cigna and Aetna).

151. Those assurances provided that:

      (a) An independent third party free of conflicts is needed that uses a fair, objective and reliable database;

      (b) An independent database would be created and operated through a not-for-profit corporation that will own the new database and collect data from contributors and publish rate information in a public and transparent way;

      (c) The not-for-profit corporation will create a website available to the public to disclose out-of-network reimbursement rates. It will include a search function that will clearly indicate the prevailing charge in a given area;

      (d) Insurers will provide information to its members explaining the method of determining reimbursement rates including that Ingenix is owned by UHG, and will explain that a new database is being created;

COMPLAINT

1       (e)     Insurers will contribute to fund the creation of the new database.

2 Defendant UHG agreed to pay $50 million; Defendant WellPoint agreed to $10

3 million; Aetna agreed to $20 million; and Cigna to $10 million; and

4       (f)     Once the new database is created, insurers have 60 days to cease

5 operating and using the Ingenix Database.

6 **WELLPOINT'S FIDUCIARY OBLIGATIONS UNDER ERISA**

7     152.  With respect to all of its healthcare plans, WellPoint is obligated to its

8 plan members to provide specific healthcare benefits and reimbursements. As such,

9 WellPoint is an ERISA fiduciary for the ERISA health plan at issue. As such,

10 WellPoint owes its plan members (including Plaintiff) the fiduciary duties of care and

11 loyalty, and it must apply its plan provisions in good faith. As detailed herein,

12 however, WellPoint has breached, and continues to breach, its obligations to Plaintiff

13 and other plan members, and in so doing has violated ERISA.

14     153.  Under ERISA, WellPoint is required, among other things, to comply with

15 the terms and conditions of its health care plans; to afford plan members an

16 opportunity to obtain a "full and fair review" of any denied or reduced

17 reimbursements; and to make certain disclosures to plan members, such as accurately

18 setting forth plan terms; explaining the specific reasons why a claim is denied and the

19 internal rules and evidence that underlie such determinations; disclosing the basis for

20 its interpretation of plan terms; and providing appropriate data and documentation

21 concerning its coverage decisions.

22     154.  The federal common law of trusts, which is applicable to ERISA

23 fiduciaries such as WellPoint, furthers requires that fiduciaries deal honestly with plan

24 members and adhere to certain specific fiduciary standards in their dealings.

25     155.  In offering and administering its healthcare plans, WellPoint, under the

26 law of ERISA, assumes the role of "Plan Administrator," as that term is defined under

27 ERISA, in that it interprets and applies the plan terms, makes all coverage decisions,

28 and provides for payment in the form of medical reimbursements to plan members

COMPLAINT

and/or their providers. As the Plan Administrator, WellPoint also assumes various obligations specified under ERISA. These obligations include providing its plan members with a "summary plan description" ("SPD"), a document designed to describe in layperson's language the material terms, conditions and limitations of the healthcare plan. The full details of the plan, which are summarized in the SPD, are contained in the EOCs.

156. WellPoint is obligated under ERISA to make its coverage determinations in a manner consistent with the disclosures contained in the SPD. To the extent there is a disparity or conflict between the SPD and the EOC, the SPD governs, so long as the plan member benefits from the application of the SPD. If the employer, rather than WellPoint, is deemed to be the Plan Administrator, WellPoint remains responsible for ensuring that the SPD complies with the law under its duties as a co-fiduciary as provided in ERISA, 29 U.S.C. §1105, even if the employer prepares or disseminates the SPD.

157. WellPoint breached its fiduciary duties by failing to disclose the actual and true reimbursement rules it uses to reduce Plaintiff's benefits, by knowingly using inaccurate, flawed, and fabricated data from the Ingenix Database to calculate UCRs, by knowingly delegating its duty to collect accurate information regarding UCRs to Ingenix (whom WellPoint knew was relying upon flawed data), and by failing to fulfill its obligations of good faith, due care and loyalty. Moreover, WellPoint breached its duties by manipulating the data it contributed to Ingenix so as to artificially depress the data it relied upon in setting UCRs for ONS.

## CLASS ALLEGATIONS

158. Plaintiff brings this action on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following Classes:

COMPLAINT

**Antitrust Damages Class**

> All persons or entities who paid premiums for out-of-network health insurance coverage from WellPoint and received reimbursement for ONS between January 1, 1998 and the present.

**ERISA Damages Class**

> All persons or entities who paid premiums for out-of-network health insurance coverage under ERISA-governed plans from WellPoint and received reimbursement for ONS between January 1, 1998 and the present.

**Injunctive Relief Class**

> All persons or entities who pay premiums for out-of-network health insurance coverage from WellPoint.

159. Excluded from each of the above Classes are the Court and its officers, employees and relatives, each Defendant and Co-Conspirator and any entity in which any Defendant or con-conspirator has a controlling interest, and their respective directors, officers, employees, and relatives; any governmental entities; and counsel for Plaintiff, including its partners, employees, and agents who purchased such out-of-network health insurance coverage during the Class Period.

160. The ERISA Damages Class seeks equitable and declaratory relief against WellPoint for breaches of its fiduciary duties under ERISA as well as unpaid benefits under ERISA for WellPoint's breach of the terms of its group health plans.

161. The Antitrust Damages Class seeks compensatory and treble damages against all Defendants, as well as appropriate equitable and declaratory relief, under the Sherman Act.

162. Each of the above Classes consists of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1). The disposition of the claims in each of the above Classes in a single class action will provide substantial benefits to all parties and to the Court.

163. Plaintiff's claims are typical of the claims of in each of the above Classes, as required by Rule 23(a)(3), in that the representative Plaintiff, like all

COMPLAINT

members of each of the above Classes, paid premiums for out-of-network health insurance coverage from WellPoint and received reimbursement for out-of-network medical services that was based on a UCR provided by Ingenix. Plaintiff, like all members of the above Classes, has been damaged by Defendants' and their Co-Conspirators' misconduct because, among other things, he was misled as to the quality of the out-of-network health insurance coverage he purchased from Aetna and has been under-reimbursed for out-of-network medical expenses.

164. The factual and legal bases of Defendants' and their Co-Conspirators' misconduct are common to the members of each of the above Classes and represent a common thread of fraud and other misconduct resulting in injury to Plaintiff and members of the each of the above Classes.

165. There are many questions of law and fact common to Plaintiff and each of the above Classes, and those questions predominate over any questions that may affect individuals in each of the above Classes, within the meaning of and fulfilling Rules 23(a)(2) and 23(b)(3). Common questions of law and fact include, but are not limited to, the following:

(a) whether Defendants and their Co-Conspirators engaged in a deceptive scheme of improperly manipulating and/or using improperly manipulated UCRs used as the basis for out-of-network reimbursement;

(b) whether Defendants and their Co-Conspirators artificially lowered reimbursements for out-of-network medical services;

(c) whether it was the policy and practice of Defendants and their Co-Conspirators to prepare marketing and sales materials that contained false and misleading information regarding the extent of out-of-network coverage provided under their plans;

(d) whether Defendants and their Co-Conspirators engaged in a pattern and practice that caused Plaintiff and members of the Classes to incur excessive out-of-pocket expenses under their plans;

COMPLAINT

1     (e)    whether Defendants and their Co-Conspirators engaged in a pattern

2 of deceptive conduct as to Plaintiff and the members of the Classes;

3     (f)    whether Defendants and their Co-Conspirators engaged in a

4 contract, combination or conspiracy to fix UCRs;

5     (g)    the duration and extent of the combination or conspiracy alleged

6 herein;

7     (h)    whether the alleged combination and conspiracy violated Section 1

8 of the Sherman Act;

9     (i)    whether WellPoint's use of the Ingenix Database to calculate

10 UCRs for ONS breached WellPoint's legal obligations to its plan members in group

11 health plans;

12     (j)    whether WellPoint's ONS ABDs violated ERISA;

13     (k)    whether WellPoint violated its fiduciary duties under ERISA;

14     (l)    whether WellPoint's claims review procedures comply with

15 ERISA's; and

16     (m)    whether, in addition to unpaid benefits, interest should be added to

17 the payment of unpaid benefits under ERISA.

18     166.    Plaintiff will fairly and adequately represent and protect the interests of

19 the above Classes, as required by Rule 23(a)(4). Plaintiff has retained counsel with

20 substantial experience in prosecuting nationwide consumer class actions. Plaintiff and

21 his counsel are committed to vigorously prosecuting this action on behalf of the

22 Classes, and have the financial resources to do so. Neither Plaintiff nor his counsel

23 has any interest adverse to those of the Classes.

24     167.    Plaintiff and members of the above Classes have all suffered, and will

25 continue to suffer, harm and damages as a result of the unlawful and wrongful conduct

26 alleged herein. A class action is superior to other available methods for the fair and

27 efficient adjudication of this controversy under Rule 23(b)(3). Absent a class action,

28 most members of the above Classes likely would find the cost of litigating their claims

COMPLAINT

1 to be prohibitive, and would have no effective remedy at law. The class treatment of
2 common questions of law and fact is also superior to multiple individual actions or
3 piecemeal litigation in that it conserves the resources of the Courts and the litigants,
4 and promotes consistency and efficiency of adjudication. Additionally, Defendants
5 and their Co-Conspirators have acted and failed to act on grounds generally applicable
6 to Plaintiff and the above Classes and require Court imposition of uniform relief to
7 ensure compatible standards of conduct toward the above Classes, thereby making
8 appropriate equitable relief to the above Classes as a whole within the meaning of
9 Rules 23(b)(1) and (b)(2).

10                              **FRAUDULENT CONCEALMENT**

11        168.   Each Defendant and Co-Conspirator concealed its fraudulent conduct
12 from Plaintiff and the members of the Classes (as set forth below) by conspiring to
13 manipulate the process by which reimbursement rates were set. Defendants and their
14 Co-Conspirators also prevented Plaintiff and the members of the Classes from
15 knowing or discovering the actual methodology used by Ingenix to determine the
16 UCRs. Moreover, the fraudulent conduct alleged herein was of such a nature as to be
17 self-concealing.

18        169.   Each Defendant's and their Co-Conspirators' efforts to conceal its source
19 and methodology of determining UCRs indicate that it knew that its conduct was
20 fraudulent.

21        170.   Thus, each Defendant and Co-Conspirator participated in the Ingenix
22 scheme by concealing that it was providing flawed data to Ingenix and/or knew the
23 methodology used by Ingenix to calculate UCRs was inherently flawed. As a result,
24 each Defendant and Co-Conspirator knew that the UCRs it used to set its
25 reimbursement rates were lower than the actual costs of medical services.

26        171.   Plaintiff was diligent in pursuing an investigation of the claims asserted
27 in this Complaint. Through no fault of his own, he did not receive inquiry notice nor

28

COMPLAINT
                                        - 42 -

1 learn of the factual basis for his claims in this Complaint and the injuries suffered until

2 the recent disclosures in the press and media in February 2008.

3 **TOLLING OF APPLICABLE STATUTES OF LIMITATION**

4 172. Any applicable statutes of limitations have been tolled by Defendants'

5 and their Co-Conspirators' knowing and active concealment and denial of the facts

6 alleged herein. Plaintiff and members of the Classes have been kept in ignorance of

7 vital information essential to knowledge of and the pursuit of these claims, without

8 any fault or lack of diligence on their part. Plaintiff and members of the Classes could

9 not reasonably have discovered the fraudulent scheme to manipulate the

10 reimbursement rates paid by Defendants and their Co-Conspirators to insureds for out-

11 of-network claims.

12 173. Defendants and their Co-Conspirators were, and continue to be, under a

13 continuing duty to disclose to Plaintiff and the Classes the fact that their

14 reimbursement rates for out-of-network medical expenses were based on UCRs that

15 bore, and continue to bear, no relationship to the actual charges for those medical

16 expenses. Because of their knowing, affirmative, and/or active concealment of the

17 fraudulent nature of the UCRs, Defendants and their Co-Conspirators are estopped

18 from relying on any statutes of limitations.

19 **FIRST CLAIM FOR RELIEF**

20 **VIOLATION OF SECTION 1 OF**
**THE SHERMAN ANTITRUST ACT**

21 **15 U.S.C. §1**
**(Against All Defendants)**

22 174. Plaintiff incorporates herein by reference each of the allegations

23 contained in the preceding paragraphs of this Complaint. Plaintiff brings this claim on

24 behalf of the Antitrust Damages and Injunctive Relief Classes.

25 175. From a date unknown, but beginning at least as early as January 1, 1998,

26 and continuing through the present, Defendants and their Co-Conspirators have

27

28

COMPLAINT

combined, conspired and/or contracted to restrain interstate trade in violation of 15 U.S.C. §1.

176. The combination or conspiracy alleged in this Complaint consisted of a continuing agreement, understanding or concert of action by the Defendants and their other Co-Conspirators, the substantial terms of which were to create, maintain and use the Ingenix Database to produce artificially low UCRs for reimbursement of ONS.

177. The conspiracy was intended to directly affect the end payors of the medical services covered by out-of-network insurance plans. The intent, purpose and effect of the conspiracy was to cause under-reimbursement for medical services, and thereby minimize reimbursement payments made on such claims among Defendants and their Co-Conspirators.

178. Through the conspiracy, Defendants and their Co-Conspirators have in fact caused a decrease in reimbursement or payments for out-of-network medical services but for their anticompetitive conduct.

179. As the result of the wrongful conduct alleged herein, Plaintiff and the Antitrust Damages Class paid higher out-of-pocket payments for out-of-network medical services than they would have paid but for Defendants' and their Co-Conspirators' anticompetitive conduct, have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

180. The conduct of Defendants and their Co-Conspirators constitutes a violation of §1 of the Sherman Act, 15 U.S.C. §1. Plaintiff and the Antitrust Damages Class are entitled to recover all damages and treble damages allowed under §1 of the Sherman Act against Defendants, jointly and severally, together with their costs of suit, including reasonable attorneys' fees, as well as any necessary injunctions to bar or abate Defendants' anticompetitive acts.

COMPLAINT

## SECOND CLAIM FOR RELIEF

### CLAIM FOR UNPAID BENEFITS UNDER GROUP PLANS GOVERNED BY ERISA
### 29 U.S.C. §1132(a)(1)(B)
### (Against WellPoint)

181. Plaintiff repeats the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

182. WellPoint must pay benefits to WellPoint plan members that are insured by, funded by or administered by WellPoint pursuant to the terms of their ERISA plans.

183. WellPoint violated its legal obligations under ERISA and federal common law when it made the ONS ABDs described in this Complaint.

184. WellPoint's lack of disclosure to its plan members, including Plaintiff, violated its legal obligations.

185. WellPoint violated obligations each time it engaged in conduct that discouraged or penalized plan members' use of ONS providers, such as by making ONS ABDs.

186. Plaintiff, on his own behalf and on behalf of the members of the ERISA Damages Class seeks unpaid benefits, recalculated deductible and coinsurance amounts and interest back to the date his claims were originally submitted to WellPoint. Plaintiff requests attorneys' fees, costs, prejudgment interest and other appropriate relief against WellPoint.

## THIRD CLAIM FOR RELIEF

### FAILURE TO PROVIDE FULL & FAIR REVIEW REQUIRED BY ERISA
### 29 U.S.C. §1132(a)(3)
### (Against WellPoint)

187. Plaintiff repeats the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

188. WellPoint functioned, and continues to function, as the "plan administrator" within the meaning of such term under ERISA for Plaintiff. During the

COMPLAINT

1  Class Period, Plaintiff and the Classes were entitled to receive a "full and fair review"

2  of all claims denied by WellPoint, and are entitled to assert a claim under 29 U.S.C.

3  §1132(a)(3) for failure to comply with these requirements.

4       189. Although WellPoint was obligated to do so, WellPoint failed to provide a

5  "full and fair review" of denied claims pursuant to 29 U.S.C. §1133 (and the

6  regulations promulgated thereunder) for Plaintiff and the ERISA Damages Class by

7  making ONS ABDs that are inconsistent with, or unauthorized by, the terms of

8  members' EOCs and SPDs, as well as by failing to disclose data, its methodology and

9  other critical information relating to its ONS ABDs.

10       190. The law and implementing regulations set forth minimum standards for

11  claim procedures, appeals, notice to members and the like. In engaging in the conduct

12  described herein, including use of an invalid database for calculating UCRs,

13  WellPoint failed to comply with ERISA, its regulations and federal common law. As

14  a result, WellPoint failed to provide a "full and fair review," failed to provide

15  reasonable claims procedures, and failed to make necessary disclosures to its plan

16  members.

17       191. Plaintiff appealed his claims review and thus exhausted his administrative

18  remedies.

19       192. Furthermore, appeal of Plaintiff's and the ERISA Damages Class's

20  claims should be deemed exhausted or excused by virtue, *inter alia*, of WellPoint's

21  numerous and systematic procedural and substantive violations.

22       193. During the Class Period, Plaintiff and the ERISA Damages Class have

23  been harmed by WellPoint's failure to provide a "full and fair review" of appeals

24  under 29 U.S.C. §1133, and by WellPoint's failure to disclose relevant information in

25  violation of ERISA and the federal common law.

26

27

28

COMPLAINT

# FOURTH CLAIM FOR RELIEF

## FAILURE TO PROVIDE AN ACCURATE EOC AND SPD
### 29 U.S.C. §1132(c)
### (Against WellPoint)

194.    Plaintiff repeats the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

195.    WellPoint's disclosure obligations under ERISA include furnishing accurate materials summarizing its group health plans, known as SPD materials, under 29 U.S.C. §1022.  WellPoint's failure to supply accurate EOCs, SPDs and other required information is actionable under 29 U.S.C. §1132(c).

196.    WellPoint's failure to disclose material information about its ONS ABDs, and its contribution of flawed data to Ingenix and its use of such data, violated ERISA, federal regulations and federal common law.

197.    During the Class Period, Plaintiff and the ERISA Damages Class have been proximately harmed by WellPoint's failure to comply with 29 U.S.C. §1022, federal regulations, and federal common law, in an amount to be determined at trial, and are also entitled to injunctive and declaratory relief to remedy WellPoint's continuing violation of these provisions.

# FIFTH CLAIM FOR RELIEF

## VIOLATION OF FIDUCIARY DUTIES OF LOYALTY AND DUE CARE
### 29 U.S.C. §1002(21)(A); 29 U.S.C. §1104(a)(1)(B) and (D)
### (Against WellPoint)

198.    Plaintiff repeats the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

199.    During the Class Period, WellPoint acted as a "fiduciary" to Plaintiff and the Classes as such term is understood under 29 U.S.C. §1002(21)(A).

200.    As an ERISA fiduciary, WellPoint owed, and owes, its plan members a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent administrator would use in the conduct of a like

COMPLAINT

enterprise. Further, ERISA fiduciaries must act in accordance with the documents and instruments governing the group plan. *See* 29 U.S.C. §1104(a)(1)(B) and (D). In failing to act prudently, and in failing to act in accordance with the documents and instruments governing the plan, WellPoint violated its fiduciary duty of care.

201. As an ERISA fiduciary, WellPoint owed, and owes, its plan members a duty of loyalty, defined as an obligation to make decisions in the interest of its plan members, and to avoid self-dealing or financial arrangements that benefit it at the expense of its plan members under 29 U.S.C. §1106. WellPoint cannot, for example, make benefit determinations for the purpose of saving money at the expense of its plan members.

202. WellPoint violated its fiduciary duties of loyalty and due care by, *inter alia*, making ONS ABDs that were unauthorized by EOCs and SPDs and which benefited WellPoint at the expense of WellPoint plan members; failing to inform WellPoint plan members of flaws in the Ingenix Database that make their use inappropriate to calculate UCR reimbursement; making false representations and explanations for its ONS ABDs; misrepresenting material facts to regulators, sending baseless overpayment actions to collection, failing to disclose in pre-authorizing action appeals that WellPoint's ONS ABDs would leave the member financially responsible for the bulk of the "approved" ONS; and for violating federal and state law.

203. WellPoint also violated its fiduciary duties by using noncompliant SPDs required by federal law.

204. WellPoint breached its fiduciary duties by sending non-compliant EOCs and other communications to Plaintiff and the ERISA Damages Class.

205. Plaintiff and the ERISA Class are entitled to assert a claim for relief for WellPoint's violation of its fiduciary duties under 29 U.S.C. §1132(a)(3), including injunctive and declaratory relief, and its removal as a breaching fiduciary.

COMPLAINT

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.     The Court determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and declare Plaintiff as representative of the Classes and his counsel as counsel for those Classes;

B.     The Court determine the conduct alleged herein be unlawful;

C.     The Court enjoin Defendants from continuing the unlawful activities alleged herein;

D.     The Court order WellPoint to recalculate and issue unpaid benefits to Plaintiff and members of the Classes that were underpaid as a result of WellPoint's ONS ABDs;

E.     The Court declare that WellPoint has breached the terms of its EOCs and SPDs and awarding unpaid benefits to Plaintiff and the Classes, as well as awarding injunctive and declaratory relief to prevent WellPoint's continuing ONS ABDs that are undisclosed and unauthorized by EOCs and SPDs;

F.     The Court declare that WellPoint has violated its fiduciary duties including the duties of loyalty and care to Plaintiff and the Classes, and awarding appropriate relief, including unpaid benefits, restitution, interest, declaratory and injunctive relief to Plaintiff and the Classes, and removing WellPoint and any of its agents, divisions, subsidiaries, or other affiliates as fiduciaries;

G.     The Court declare that WellPoint has failed to provide a "full and fair review" to Plaintiff and the Classes under 29 U.S.C. §1133, and awarding injunctive, declaratory and other equitable relief to Plaintiff and the members of the Classes to ensure compliance with ERISA and its regulations;

H.     The Court declare that WellPoint has violated its disclosure and related obligations under ERISA and federal common law, including under 29 U.S.C.

COMPLAINT

§1022, for which Plaintiff and the Classes are entitled to injunctive, declaratory and other equitable relief;

I.    The Court award Plaintiff and the Classes monetary damages as provided for under federal law, including any trebling or special damages allowable under law;

J.    The Court award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees, experts' fees and all other expenses as provided by law;

K.    The Court award pre and post judgment interest; and

L.    The Court grant such other and further relief as is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial in all issues so triable.

DATED: March 19, 2009

SCOTT + SCOTT, LLP
CHRISTOPHER M. BURKE
KRISTEN M. ANDERSON

CHRISTOPHER M. BURKE
5455 Wilshire Blvd., Suite 1800
Los Angeles, CA 90035
Telephone: 213/985-1274
213/985-1278 (fax)
cburke@scott-scott-com
kanderson@scott-scott.com

SCOTT + SCOTT, LLP
DAVID R. SCOTT
AMANDA LAWRENCE
JOHN F. BURKE
108 Norwich Avenue
Colchester, CT 06415
Telephone: 860/537-3818
860/537-4432 (fax)
drscott@scott-scott.com

COMPLAINT

- 50 -

JOSEPH E. GUGLIELMO
29 West 57th Street, 14th Floor
New York, NY 10019
Telephone: 212/223-6444
212/223-6334 (fax)
jguglielmo@scott-scott.com

DOYLE LOWTHER LLP
JOHN A. LOWTHER IV
JAMES R. HAIL
9466 Black Mountain Road, Suite 210
San Diego, CA 92126
Telephone: 619/573-1700
619/573-1701 (fax)
john@doylelowther.com
jim@doylelowther.com

ARLEO LAW FIRM, PLC
Elizabeth J. Arleo (SBN 201730)
1672 Main Street, Suite E, PMB 133
Ramona, CA 92065
Telephone: 760/789-8000
760/789-8081 (fax)
elizabeth@arleolaw.com

Counsel for Plaintiff

Wellpoint Cpt

COMPLAINT

- 51 -

COPY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Michael Roberts, on Behalf of Himself and all Others Similarly Situated<br><br>PLAINTIFF(S)<br><br>v.<br><br>UnitedHealth Group, Inc., Ingenix, Inc., Wellpoint, Inc. and Blue Cross of California<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV09-1886 PSG (CTx)**<br><br><br><br>**SUMMONS** |

TO:     DEFENDANT(S): _____

    A lawsuit has been filed against you.

    Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ___ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Christopher M. Burke_____, whose address is _5455 Wilshire Blvd., #1800, Los Angeles, CA 90035_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___**MAR 1 9 2009**___

By: ___**NATALIE LONGORIA**___

Deputy Clerk

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

1198

---

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I. (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Michael Roberts

**DEFENDANTS**
UnitedHealth Group, Inc.; Ingenix, Inc.; Wellpoint, Inc. and Blue Cross of California

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Christopher M. Burke, Scott + Scott, LLP, 5455 Wilshire Blvd., #1800, Los Angeles, CA 90035, 213/985-1274

**Attorneys** (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** – For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No   ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. § 1; 29 U.S.C. § 1132; Sherman Act

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

## CV09-1886

**FOR OFFICE USE ONLY:** Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

| | | |
|---|---|---|
| CV-71 (05/08) | CIVIL COVER SHEET | Page 1 of 2 |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | San Diego County |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Blue Cross - Los Angeles County | UnitedHealth - Minnesota; Ingenix - Minnesota; Wellpoint - Indiana |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
      **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | San Diego County |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER):  _____  Date  March 19, 2009

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Carolyn Turchin.

The case number on all documents filed with the Court should read as follows:

## CV09- 1886 PSG (CTx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.